United States District Court
for the
Southern District of Florida

| United States of America, Plaintiff | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal Case No. 17-20530-CR-Scola |
| | ) | |
| Toddrey Willie Bruce, Defendant | ) | |

### Order on Defendant's Motion to Suppress Physical Evidence and Statements

Defendant Toddrey Willie Bruce is charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). This matter is before the Court on the Defendant's Motion to Suppress Physical Evidence and Statements (ECF No. 17). The Defendant argues that the firearm and ammunition recovered from the scene of his arrest and the subsequent statements that he made while in custody should be suppressed because he was illegally seized without a warrant.

The Court held an evidentiary hearing on the Defendant's motion on December 1, 2017. At the hearing, the Court heard the testimony of Government witnesses David Espinosa and Tony Belle, Jr., both of whom are officers with the Miami-Dade Police Department. The Court also reviewed a video of the officers' encounter with the Defendant that was recorded by Espinosa's body camera, as well as an audio recording of the 911 call to which Espinosa and Belle were responding when they encountered the Defendant. After considering the credible evidence and testimony and the relevant legal authorities, and for the reasons more particularly set forth below, the motion to suppress is **denied** (**ECF No. 17**).

1. **Testimony**

   **A. David Espinosa**

   Espinosa has been employed for just over one year as a uniformed road patrol officer for the Miami-Dade Police Department. He previously served four years in the U.S. Military and served as a military police officer. As a police officer, he has responded to emergency calls hundreds of times and his primary concerns when responding to such calls are the safety of the community and officer safety.

   On March 27, 2017 in the early morning hours, he responded to a dispatch which was the result of a 911 call. The caller said there was a black

male with a firearm engaged in an argument and the black male was standing next to a white car in the driveway.

Espinosa is assigned to the Cutler Ridge area of Miami-Dade County. That night he was patrolling the Perrine area, which is a relatively small area within Cutler Ridge. Perrine is a high-crime area. Espinosa receives approximately 30 calls per night in the Cutler Ridge area and 15 of those calls – a disproportionate number – are from Perrine.

Espinosa arrived at the address provided by dispatch at 3:28 a.m., within a few minutes of the 911 call, and saw a white car with the interior light on and two persons inside the vehicle. Espinosa had his firearm withdrawn as a result of the nature of the call. Espinosa first approached the driver's side of the car and the driver complied with commands and exited the vehicle.

Espinosa and Office Price then approached the Defendant on the passenger side of the car, and Espinosa activated his body camera. He had forgotten to turn on the body camera when he approached the driver's side of the car. The Defendant had already exited the car and had his hands up. Espinosa and Price explained that they were there due to a report of a man with a gun. They ordered the Defendant to put his hands on the vehicle so a pat-down could be conducted, but the Defendant refused. When Espinosa and Price tried to put the Defendant against the vehicle, the Defendant struggled and tried to push his way through the officers to flee. During the struggle, now at the rear of the vehicle, a firearm fell out of his waistband onto the ground. Espinosa's body camera fell to the ground during the struggle and stopped recording. The entire encounter with the Defendant, from the approach to the struggle, took approximately 20 seconds.

The firearm was cleared to prevent accidental discharge. The Defendant's criminal history was run and it was learned that he was a convicted felon.

**B. Tony Belle, Jr.**

Belle has been a police officer with the Miami Dade Police Department for over one year. He is presently a detective but was a patrol officer in March 2017. While a patrol officer, he responded to hundreds of 911 calls. His primary concerns when responding to such calls are safety and determining how to react. When there is a call relating to a firearm, officer safety and the safety of others is a concern.

On March 27, 2017, in the early morning hours, he received a dispatch referencing two males standing next to a white car in front of a house arguing and one was armed with a firearm. Belle believes it was a white Nissan. Belle arrived at the address four to five minutes later. Belle's lights were activated on the patrol car but not his siren.

Out of the large geographic area that Belle patrols, the Perrine area is relatively small but makes up for almost 50% of dispatches. Perrine is a geographically small area but is a high-crime area with lots of dispatches. There are many robberies and drug crimes and it is patrolled to deter crime.

When Belle arrived at the address to which he was dispatched, there was a white car parked on the grassy area near the street. Belle drew his weapon for officer safety based upon the nature of the call and approached the vehicle on the driver's side. Belle ordered the driver to exit the vehicle and he complied. Belle told the driver that they were responding to a call about an argument involving a gun. Belle patted down the driver, who had no weapons, and directed him to sit on the ground. Two other officers approached the passenger side of the vehicle.

Belle heard the other officers dealing with the Defendant and heard that the Defendant was refusing to comply with their commands. When the Defendant started to actively resist and tried to run between the two officers, Belle headed to the passenger side of the car. Belle grabbed the Defendant and redirected him to the ground. During the course of taking the Defendant to the ground, a firearm came out of his waistband and fell on the ground.

The firearm was secured and the Defendant was handcuffed and placed in the back seat of Belle's patrol car. A search of the Defendant's criminal record revealed he was a convicted felon and was on probation for burglary. The firearm was also reported stolen.

### 2. Findings of Fact

On March 27, 2017, sometime after 3:00 a.m., a man called 911 to report a disturbance, and stated that there might be shooting. The caller stated that there was an argument in the front yard of a house that he identified as a drug house and rooming house. The caller stated that he saw a black male wearing black clothing standing next to a white car in front of the house. The caller stated that "they are arguing" and stated that he saw the man holding a gun. He told the 911 dispatcher that the officers should be careful. The caller stated that he did not wish to be contacted by officers because he had to get up early.

Within four or five minutes, three officers arrived at the address provided by the caller, which was in the Perrine neighborhood. Officers Espinosa and Belle both testified that Perrine is known as a high-crime neighborhood, and that approximately 50% of the dispatches they receive from 911 calls on any given night are in Perrine, despite the fact that Perrine is a small geographic area relative to the entire area that they are responsible for patrolling.

The officers saw a white car parked in front of the house with the interior light on and two persons inside. The officers approached the driver's side of the

car with their firearms drawn. The driver complied with the officers' commands and exited the vehicle. Officer Belle frisked the driver, found no weapons, and directed him to sit on the ground.

Meanwhile, Officers Espinosa and Price still had their weapons drawn and were approaching the Defendant on the passenger side of the car. The Defendant was standing next to the car with his hands up. The officers explained that they were there due to a report of a man with a gun. They ordered the Defendant to put his hands on the vehicle so a pat-down could be conducted, but the Defendant refused. When Officers Espinosa and Price tried to put the Defendant against the vehicle, the Defendant struggled and tried to push his way through the officers. Officer Belle grabbed the Defendant and redirected him to the ground. During the struggle, a firearm fell out of the Defendant's waistband onto the ground.

The firearm was secured and the Defendant was handcuffed and placed in the back seat of Belle's patrol car. A search of the Defendant's criminal record revealed he was a convicted felon and was on probation for burglary.

### 3. Analysis

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978) (citations omitted). However, if a defendant provides evidence of a "*warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (emphasis in original) (internal citation omitted).

The Defendant argues that he was seized the moment he exited the vehicle, and that the seizure was illegal because it was not supported by probable cause or a reasonable articulable suspicion. (Mot. 3-4.) However, the Government argues that the encounter was an investigatory stop, rather than an arrest, and that the stop was supported by reasonable suspicion. (Resp. 4-8, ECF No. 19.) "[L]aw enforcement officials may briefly detain a person as part of an investigatory stop if they have a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity." *U.S. v. Blackman*, 66F.3d 1572, 1576 (11th Cir. 1995) (citing *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220 (11th Cir. 1993)). In determining whether a seizure is an arrest or a stop, courts analyze four factors: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursued their investigation; (3) the scope and intrusiveness of the

detention; and (4) the duration of the detention." *U.S. v. Fields*, 178 Fed. Appx. 890, 893 (11th Cir. 2006) (citing *U.S. v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004)).

With respect to the first factor, "the most important consideration is whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Acosta*, 363 F.3d at 1146 (internal quotations, citations, and alterations omitted). With respect to the second factor, courts analyze "whether the methods the police used were carried out without unnecessary delay." *Id.* (citations omitted). Here, the officers acted quickly to pursue a method of investigation that was likely to confirm or dispel their suspicions and they acted without unnecessary delay. Officer Belle completed his entire confrontation of the driver of the car, including ordering him to exit the car, explaining the nature of the stop, and patting down the driver, before the Defendant even began resisting Officers Espinosa and Price. The confrontation between the Defendant and the officers lasted approximately twenty seconds.

With respect to the third factor, courts analyze "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Acosta*, 363 F.3d at 1146 (citations omitted). If officers possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous," they "may take reasonable steps to ensure their safety." *Id.* at 1146-47 (internal quotations and citations omitted). The fact that an officer draws his weapon does not automatically transform an investigatory stop into an arrest; rather, it is a factor to be taken into account in determining whether the encounter was an investigatory stop or an arrest. *Id.* at 1147 (citations omitted). As more fully set forth below, the officers had a reasonable belief that the Defendant was potentially armed. Moreover, the scope and intrusiveness of the detention did not exceed the amount needed by the officers to ensure their personal safety.

The Defendant was unquestionably seized when he was ordered to exit the car at gunpoint. However, based on the foregoing analysis, the Court concludes that the encounter was a brief, investigatory stop rather than an arrest.

The Court also concludes that the stop was supported by reasonable suspicion. "When evaluating whether reasonable suspicion exists . . . the district court must examine the totality of the circumstances to determine whether the arresting officer had a particularized and objective basis for suspecting legal wrongdoing." *Fields*, 178 Fed. Appx. at 892 (internal quotations and alterations omitted). Reasonable suspicion "may be based on information supplied by another person, so long as the information bears

sufficient indicia of reliability." *Id.* (citing *Adams v. Williams*, 407 U.S. 143 (1972)).

However, "even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, 134 S.Ct. at 1690 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The Eleventh Circuit has "found a defendant's presence in a high crime area and his nervous or evasive behavior are relevant factors in determining reasonable suspicion." *Fields*, 178 Fed. Appx. at 892 (citations omitted); *see also U.S. v. Lewis*, 674 F.3d 1298, 1309 (11th Cir. 2012) ("We add that the detention took place at night in a high crime area, which, while surely not dispositive, is still another relevant consideration in the *Terry* calculus.") (citations omitted). In addition, the Eleventh Circuit has recognized that "[l]aw enforcement officers are at greatest risk when dealing with potentially armed individuals . . . A law enforcement officer 'responding to a tip involving guns may take these hazards into consideration when balancing the suspect's interests against the need for law enforcement officers to protect themselves and other prospective victims of violence.'" *U.S. v. Gibson*, 64 F.3d 617, 624 (11th Cir. 1995) (quoting *United States v. Clipper*, 973 F.2d 944, 951 (D.C. Cir. 1992)).

The Defendant argues that the facts here are most similar to *Florida v. J.L.*, in which an anonymous caller reported to the police that a black male wearing a plaid shirt standing at a particular bus stop was carrying a gun. 529 U.S. 266, 268 (2000). The Supreme Court held that "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about the [defendant]" was insufficient to create a reasonable suspicion of unlawful conduct. *Id.* at 271. However, in *Navarette v. California*, the Supreme Court noted that a report that is contemporaneous with the observation of criminal activity "has long been treated as especially reliable." *Navarette v. California*, 134 S.Ct. 1683, 1689 (2014). There, a 911 caller reported being run off the road by another car. *Id.* at 1686-87. The Court stated that eyewitness knowledge of the alleged activity "lends significant support to the tip's reliability." *Id.* (citations omitted). In addition, the Court noted that a caller's use of the 911 emergency system is "[a]nother indicator of veracity," because a 911 call can be recorded and traced, and a false report can be prosecuted. *Id.* at 1689-90.

Here, the 911 call was placed around 3:00 a.m. in a high crime area. The caller contemporaneously provided information to the 911 dispatcher as he was observing the Defendant. He included details such as the fact that the house in front of which the car was parked was a rooming house that was associated with narcotics. He stated that a disturbance was taking place and stated that there "might be shooting" soon. He also described a black male with black

clothing standing next to a white vehicle that was parked in front of the rooming house. He told the dispatcher that he saw the black male holding a gun and asked the dispatcher to tell the officers to use caution. The officers arrived at the house within four or five minutes and found the white car parked on the lawn as described by the caller. The Defendant refused to comply with officers' orders and physically resisted the officers when they attempted to place his hands on the car. Although it is a close question, the Court finds that the facts of this case are more closely analogous to *Navarette* than *J.L.* and that, based on the totality of the circumstances, the officers had reasonable suspicion to conduct an investigative stop.

### 4. Conclusion

The temporary investigative stop of the Defendant was supported by reasonable suspicion. Accordingly, the Court **denies** the Defendant's motion to suppress (**ECF No. 17**).

**Done and ordered** at Miami, Florida on December 5, 2017.

_____
Robert N. Scola, Jr.
United States District Judge